IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

**THERESA MORIARTY** and
**DOUG GARRABRANT**,

      Plaintiffs,

v.                                                                           No. 1:11-cv-00722-JAP/KBM

**BOARD OF COUNTY COMMISSIONERS FOR
THE COUNTY OF SANDOVAL**, **JOHN PAUL TRUJILLO**,
**TIM LUCERO**, and **EDD MORRISON**,
in their individual and official capacities,

      Defendants.

<u>**MEMORANDUM OPINION AND ORDER**</u>

      In this MEMORANDUM OPINION AND ORDER ("Order"), the Court addresses three

motions by Defendants, Board of County Commissioners for the County of Sandoval ("Board"),

John Paul Trujillo, Tim Lucero, and Edd Morrison. First, the Court denies the OBJECTION TO

PLAINTIFFS' NOTICE OF SUPPLEMENTATION OF THEIR RESPONSE IN OPPOSITION

TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Doc. No. 113) ("Objection"),

in which Defendants argue that the Court should refuse to consider an affidavit that Plaintiffs

belatedly filed to authenticate a report by D.P. Van Blaricom, one of Plaintiffs' proposed expert

witnesses. Second, the Court grants in part the MOTION TO EXCLUDE TESTIMONY OF

PROPOSED EXPERT VAN BLARICOM (Doc. No. 74) ("Motion to Exclude Van Blaricom"),

in which Defendants argue that the Court should exclude certain opinions in Mr. Van Blaricom's

report. Third, the Court grants the MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS'

TITLE 42 U.S.C. § 1983 CLAIM BASED ON QUALIFIED IMMUNITY AND OTHER

GROUNDS (Doc. No. 72) ("Motion for Summary Judgment"), in which Defendants contend

that Plaintiff Theresa Moriarty "cannot satisfy all of the elements of a § 1983 state-created

danger case," and that even if she could, "she cannot establish the individual Defendants violated

clearly established law," or, as a result, that Defendant Board is vicariously liable. Motion for

Summary Judgment at 2, 39-40. Finally, the Court remands Plaintiffs' state-law claims to the

Thirteenth Judicial District Court, County of Sandoval, New Mexico.[1]

On January 10, 2013, the Court held a pretrial conference at which counsel presented

arguments related to the Motion for Summary Judgment. At the pretrial conference, attorneys

Cammie Nichols and Brendan Egan represented Plaintiffs, and attorney P. Scott Eaton

represented Defendants. The Court also requested supplementary briefing, which was completed

on January 28, 2013.[2] In ruling on these motions, the Court has considered the record in this

case, the parties' arguments, and the relevant law.

## BACKGROUND[3]

This case arises out of an operation by the Sandoval County Sheriff's Office ("SCSO") to

apprehend an individual known as the "Cookie Bandit" who, for perhaps ten years, had been

---

[1]Defendants also filed a MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' STATE TORT CLAIMS (Doc. No. 71) at the same time. However, because the Court is granting summary judgment on Plaintiffs' § 1983 claim and declining to exercise supplemental jurisdiction over Plaintiffs' remaining state-law claims, the Court will not rule on the MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' STATE TORT CLAIMS.

[2]On February 1, 2013, Plaintiffs filed a MOTION FOR LEAVE TO FILE RESPONSE TO DEFENDANTS' SUPPLEMENTAL BRIEF ADDRESSING MATTERS REQUESTED BY COURT DURING PRETRIAL CONFERENCE (Doc. No. 123) ("Motion for Leave"), in which Plaintiffs request "leave to file a response brief only if the Court finds that a response . . . would be helpful or pertinent to the issues pending." Because the Court finds that a response brief would not be helpful, the Motion for Leave will be denied.

[3]The facts in this background section, which are drawn from the parties' briefs and admissible supporting evidence, are undisputed or, if disputed, viewed in a light most favorable to Plaintiffs. *See Harman v. Pollock*, 586 F.3d 1254, 1268 (10th Cir. 2009).

burglarizing cabins and eluding law enforcement in the Jemez Mountains area of Sandoval County, New Mexico.[4] *See* Investigative Report by Lieutenant Keith Elder, Plaintiffs' Exhibit 21 (Doc. No. 98-21) ("Elder Report") at 1. Plaintiff Moriarty,[5] a deputy with SCSO, and Sergeant Joe Harris, who both normally worked in schools, set out to gather information about and to capture the Cookie Bandit in the summer of 2009. *See id.* at 2; Deposition of Timothy Lucero, Defendants' Exhibit D (Doc. No. 72-4) ("Lucero Depo. Part 1") at 36-40. One night, Moriarty and Harris managed to apprehend and handcuff the Cookie Bandit, but the Cookie Bandit then somehow retrieved a gun, with which he fatally shot Harris. *See* Elder Report at 2.

A.    <u>**Moriarty's Law Enforcement Background and Work With SCSO**</u>

Moriarty was a police officer with the New York Police Department ("NYPD") for twenty years, retiring in 2004. *See* Deposition of Theresa Moriarty, Defendants' Exhibit B (Doc. No. 72-2) ("Moriarty Depo.") at 31:21-22. Moriarty received the standard six months of NYPD Police Academy training before starting as a patrol officer. *See id.* at 62:2-4, 69:6-11, 77:3-10. For her first ten years at NYPD, Moriarty worked in mostly lower-crime areas of New York's Harlem neighborhood. *See id.* at 69:12-17. Also, for five of those ten years Moriarty participated in the NYPD's "Community Policing on Patrol" program, which entailed patrolling on foot and sometimes engaging with local school children. *See id.* at 70:5-7, 17-24; Deposition of Theresa Moriarty, Plaintiffs' Exhibit 1 (Doc. No. 98-1) ("Supp. Moriarty Depo.") at 42:2-9. In the second

---

[4]After the conclusion of the events at issue, the wanted burglar's name—Joseph Henry Burgess—became known. However, during the relevant time his real name was not known, and the parties and others referred to him as the Cookie Bandit both then and during depositions, so the Court will also use that moniker when referring to him.

[5]Because Plaintiff Doug Garrabrant only asserts a state claim not at issue in this Memorandum Opinion and Order, the Court will principally refer to Plaintiff Moriarty alone.

half of her NYPD career, Moriarty transferred to a desk job at Bronx Central Booking, where she mostly did "general office work, and typing, and administrative tasks" like ordering supplies. Moriarty Depo. at 71:10-72:5. However, while at Bronx Central Booking Moriarty still carried a weapon and occasionally worked overtime guarding prisoners. *See id.*

After retiring from the NYPD, Moriarty moved to New Mexico with her partner, Plaintiff Doug Garrabrant. *See id.* at 32:10-17. In the fall of 2006, Moriarty briefly worked as a school security guard (a position that did not require her to carry a gun or handcuffs). *See id.* at 38:2-23. However, she then met Sergeant Harris, who urged Moriarty to come out of retirement to work, as Harris did, as a school resource officer ("SRO") at SCSO. *See id.* at 39-40; Supp. Moriarty Depo. at 41-42. Moriarty initially resisted this suggestion, but eventually changed her mind and decided to apply to SCSO because of Harris' persistence and the way Harris described the SRO position. *See* Supp. Moriarty Depo. at 41-42. Harris told Moriarty that the job would be "good for [her]." *Id.* at 42:14-15. Harris described the job as a fun and community service-oriented role involving taking a dog to schools to interact with kids, as well as going to "community meetings and functions, handing out coloring books to the community, stuff like that." *Id.* at 42:11-43:22.

With Harris' encouragement, Moriarty met informally with Defendant John Paul Trujillo, who was then SCSO's elected Sheriff, and Lt. Dean Alexander, who was then the supervisor of SROs at SCSO. *See id*. at 44:1-10; Deposition of Dean Alexander, Plaintiffs' Exhibit 4 (Doc. No. 98-4) ("Alexander Depo.") at 90-91. Soon after, Moriarty began the formal application process, which included interviews with Defendant Trujillo and Defendant Timothy Lucero, who was then SCSO's Undersheriff. *See* Moriarty Supp. Depo. at 44:1-21. Moriarty recalls receiving verbal assurances from Trujillo and Alexander that she would almost exclusively work in the schools or school-related programs, even during the summer. *See id.* at 45:22-46:3; Moriarty

4

Depo. at 30:20-31:6; Alexander Depo. at 42:18-22. However, Moriarty's application certified that she could "respond appropriately in stressful situations," "[p]erform[] a wide range of patrol duties, as assigned, to enforce various laws and ordinances" and "[w]ork[] from rotating shift patrol assignments." Sandoval County Notice of Position, Plaintiffs' Exhibit 2 (Doc. No. 98-2); *see also* Moriarty Depo. at 81:13-82:3. Moriarty also acknowledges that no one ever told her that she "would never have to do any other law enforcement duties." Moriarty Depo. at 50:25-51:2. Near the start of Moriarty's work with SCSO, she took the 120 hours of "waiver training" required of law enforcement officers from other jurisdictions seeking to work with the police in New Mexico. *Id.* at 86:8-24. While working at SCSO, Moriarty also attended a number of other training sessions for use of force and weapons. *See id.* at 86-95. In particular, just three weeks before the incident at issue, Moriarty attended a two-day training program on "use of force." *Id.* at 90:12-17. A lieutenant at SCSO taught the program, part of which reviewed the importance of searching a handcuffed suspect for weapons. *See id.*; Deposition of Walter Chris Dameron, Defendants' Exhibit C (Doc. No. 72-3) ("Dameron Depo.") at 171-73.

Moriarty's primary role as an SRO was described by Dean Alexander, the former SRO supervisor at SCSO, as involving "[i]nteract[ion] most of all with the students, the parents, the faculty and administration of the school . . . provid[ing] safety and security, but primarily as a mentor to the students . . . to set a good example, show the kids that police officers aren't the enemy, they're your friends . . . ." Alexander Depo. at 38:13-17; 86:12-22. SROs present a state-approved program to classes, and some, including Moriarty, participate in the "Kasey Says" in which officers take dogs to schools to encourage better behavior in students. *See id.* at 87:10-16, 90-91. The "Kasey Says" program was one of the reasons Moriarty was originally interested in working at SCSO. *See* Supp. Moriarty Depo. at 42:11-18. Moriarty and other SROs wore a "soft

5

uniform" of police polo shirt, khakis, and a utility belt, rather than a patrol officer's "hard uniform." Alexander Depo. at 39:13-16. On an average day, Moriarty worked for about eight hours, beginning at a school crossing and then going to classes with her "Kasey Says" dog. *See* Moriarty Depo. at 49:13-20, 51:13-18. However, SROs including Moriarty also carried a gun and handcuffs, drove a marked police car, and took on regular patrol duties "a handful of times" when SCSO was short-handed. Supp. Moriarty Depo. at 46:1-8, 48-49. Over approximately a year and a half at SCSO, Moriarty took more than seventy-five reports of suspected criminal activity. *See* Affidavit of Walter Edwin Morrison, Jr., Defendants' Exhibit O (Doc. No. 72-15) ("Morrison Aff.") at ¶ 5. The reports were mostly of "bullying-type assault and battery" incidents, but also included allegations of crimes like burglaries, weapons possession, assaults and batteries, drugs and alcohol, domestic violence, and vandalism. Moriarty Depo. at 52-53.

After their first meeting, Moriarty and Harris became good friends "right away." *Id.* at 125:2-4. Moriarty considered Harris both her partner and a "brother" to her, but he was also her supervisor at work, and as a veteran of the NYPD's "paramilitary organization," Moriarty was used to obeying commands from and taking questions to her supervisor, and would never "jump rank" to take concerns to someone else. *Id.* at 128:16-19, 135:9-17, 144:20-23. However, Moriarty trusted Harris and felt able to "share secrets . . . with [him] and trust that that would be confidential," including telling him if she had complaints about others at SCSO or any concerns about not wanting to do an assignment. *Id.* at 130:22-131:6.

**B.**    **The Cookie Bandit's History, Known Dangerousness, and Investigations by SCSO**

A persistent series of burglaries of cabins in the Jemez Mountains area began in around 1998. *See* Sandoval County Sheriff's Department Investigative Report (Supplemental Report), Plaintiffs' Exhibit 21 (Doc. No. 98-21) ("SCSO Supp. Report"). Many of the burglaries fit a

pattern, leading Jemez area residents and officials at SCSO to believe that a single culprit was responsible. *See id.*; Dameron Depo. at 16:5-19. In this pattern, the Cookie Bandit, as he came to be known, mainly stole food and similar non-saleable items. *See* Elder Report at 1. But SCSO also received a few reports of firearms being stolen from cabins, and a report of an incident in which the Cookie Bandit told a local couple who confronted him "to back off, he had a gun." Deposition of Jason Benally, Plaintiffs' Exhibit 5 (Doc. No. 98-5) ("Benally Depo.") at 54:12-23; Sandoval County Sheriff's Office Supplemental Report by Edd Morrison, Plaintiffs' Exhibit 23 (Doc. No. 98-23) ("Morrison Supp. Report") at 2. SCSO also received a report in 1998 that a man brandished a pistol at a local fire chief. *See* Morrison Supp. Report at 2. This was early in the Cookie Bandit's Jemez career, but those at SCSO and elsewhere generally thought that it was the Cookie Bandit who had brandished the pistol. *See* Deposition of Timothy Lucero, Plaintiffs' Exhibit 16 (Doc. No. 98-16) ("Lucero Depo. Part 2") at 135:4-13, 139:9-15, 145:20-24. Based on such reports, Defendants and others at SCSO believed that the Cookie Bandit was armed and dangerous. *See* Lucero Depo. Part 2 at 134-35, 153 6:11; Deposition of Edd Morrison, Plaintiffs' Exhibit 20 (Doc. No. 98-20) ("Morrison Depo. Part 4") at 21:18-20; Benally Depo. at 55. Also, after a team from SCSO, including Morrison, dismantled what they believed to be the Cookie Bandit's campsite in 2008, the Cookie Bandit's "entering cabins became more forceful and destructive," causing much property damage. Morrison Supp. Report at 2.

In 2008, at Morrison's suggestion, Trujillo gave a reserve deputy commission to Luke Dienlin, a hunter who was interested in tracking the Cookie Bandit. *See* Deposition of Edd Morrison, Plaintiffs' Exhibit 17 (Doc. No. 98-17) ("Morrison Depo. Part 3") at 39-40. That fall and winter, Dienlin hiked in the Jemez with a friend numerous times. *See* Deposition of Luke Dienlin, Plaintiffs' Exhibit 7 (Doc. No. 98-7) ("Dienlin Depo.") at 47-48. The pair thought they

were close to the Cookie Bandit at times, but never caught up with him. *See id.* Morrison had warned Dienlin that the Cookie Bandit may be armed and dangerous, told Dienlin to be careful, and ensured that he had a bullet-proof vest and adequate weapons. *See id.* at 14, 20:12-14, 22:9-16. Dienlin and his friend each carried multiple firearms when they went out to look for the Cookie Bandit. *See id.* at 19:3-8. Dienlin was wearing a bullet-proof vest when, in November 2008, he went out alone to track the Cookie Bandit. *See id.* at 62-63, 75. In the dark of the night, Dienlin took fire from someone with a .45 caliber gun. *See id.* at 67-75 A bullet hit Dienlin in the chest, injuring him despite the vest, and he began to cough up blood. *See id.* at 68: 4-15. As a result, Dienlin turned back rather than pursue the shooter, whom he did not see. *See id.* at 68-72. However, based on the proximity of footprints Dienlin found to cabins and a former campsite of the Cookie Bandit, and on the "size, stride, and design" of shoe impressions he saw, Dienlin believed the shooter was the Cookie Bandit. *Id.* at 68-70; Incident Report for Assault/ Battery on Luke Dienlin, Plaintiffs' Exhibit 32 (Doc. No. 98-32) ("SCSO Dienlin Report") at 2. Dienlin did not immediately report the shooting because he thought that SCSO would then want to take away his commission. *See* Dienlin Depo. at 22:20-25. However, Dienlin did file a report with SCSO about five days after the incident. *See* SCSO Dienlin Report at 1. Lt. Jason Benally, who then held the lower rank of sergeant, suggested that someone "needed to go to the area [where Dienlin was shot] and try to secure the scene" and look for evidence, but Benally does not think that any investigation happened, nor was the state police notified. Benally Depo. at 63:17-64:24. Many at SCSO took a dismissive attitude toward Dienlin's story, suspecting that Dienlin accidentally shot himself. *See* Lucero Depo. Part 2 at 115; Baron Aff. at ¶ 10.

Prior to Dienlin's time hunting the Cookie Bandit, Morrison had long been involved in putting together plans and small operations to try to apprehend the Cookie Bandit. *See* Morrison

Depo. Part 4 at 109:16-21. Morrison often went up to the Jemez area and looked for the Cookie Bandit by "walking the trails, [going] up on a four-wheeler, riding a horse," as well as staying in cabins overnight to see if the Cookie Bandit would break in. *See id.* at 108-109; Deposition of Edd Morrison, Defendants' Exhibit F (Doc. No. 72-6) ("Morrison Depo. Part 1") at 21:15-20. "Many other SCSO deputies spent time in the Jemez area investigating the Cookie Bandit as well," including Lucero, who went with Morrison "and set up on cabins on several occasions." Morrison Aff. at ¶ 8; Lucero Depo. Part 2 at 144:14-19. SCSO coordinated with the state police at least twice when SCSO deputies thought they had found the Cookie Bandit's location and called on state SWAT teams to look inside cabins. *See* Lucero Depo. Part 2 at 152-155. The FBI was also involved in an SCSO operation in the Jemez to find a missing person who may have been out to get the Cookie Bandit and the corresponding bounty.[6] *See* Dameron Depo. at 17; Morrison Depo. Part 1 at 22:12-23:16. The U.S. Forest Service, too, helped investigate the burglaries on certain occasions. *See* Morrison Depo. Part 3 at 23:17-24:13.

Not everyone thought SCSO was doing a good job of searching for the Cookie Bandit. Dean Alexander recalls talking with Morrison and Lucero many times about the case and telling them that their plans for pursuing the Cookie Bandit on ATVs, for example, or doing things "ad hoc" like "sit[ting] in a cabin and wait[ing]" for the Cookie Bandit, were inadequate. Alexander Depo. at 61-62, 70:12-21. Jason Benally also suggested sending "highly-trained, military-trained individuals" after the Cookie Bandit. Benally Depo. at 55:16-19. Benally recalls that many at SCSO questioned the wisdom of putting Moriarty and Harris on the assignment. *See id.* at 56:20-

---

[6]After the events at issue in this case, SCSO finally discovered the missing individual's remains. He had been shot with a gun of the same caliber as the gun that the Cookie Bandit used to shoot Harris. *See* Morrison Supp. Report at 12.

25. However, Benally felt that arguing with Morrison about this would be "fruitless" because of Morrison's mindset and sense of ownership about the Cookie Bandit investigation. *Id.* at 56-57.

In 2008, as noted, Morrison and a large group of other SCSO deputies, as well as Dienlin, came across what they believed was the Cookie Bandit's campsite. *See* Morrison Depo. Part 3 at 24-28. They found an array of items including "camouflage clothing[,] . . . cooking utensils[, a] cooler with spices and whatnot in it[, s]everal pairs of shoes of various sizes[,] . . . a plastic bag containing some pharmaceutical mushrooms and some military documentation with the name of Tim Cobb on it." *Id.* at 25:4-12. Morrison testified that they handled the pieces of evidence with gloves and later dusted them for fingerprints, but others remember seeing that items were pulled "barehanded" onto a tarp without being fingerprinted, then packaged up and taken out of the Jemez on ATVs. Dienlin Depo. at 118-19; Benally Depo. at 81:16-21. Jason Benally testified that the items were taken to a "garage/sally port area" at SCSO and left there for some time after being sorted into paper bags. Benally Depo. at 79:11-16, 81:16-82:16.

On some occasions when SCSO deputies investigated possible Cookie Bandit break-ins, they reported that they could not recover any fingerprints other than those of the occupants, or that they did not even attempt to recover fingerprints because of the number of other people who had handled items at the scene in the interim. *See* Plaintiffs' Exhibits 8-12 (Doc. Nos. 98–8–98–12) (reports by SCSO detectives of burglaries in Jemez area); Benally Depo. at 147:11-20. But Captain Michael Traxler, who was long involved in the Cookie Bandit investigation, says the case file shows that fingerprints were submitted to the state crime lab on at least a few occasions. *See* Affidavit of Michael Traxler, Defendants' Exhibit H (Doc. No. 72-8) ("Traxler Aff.") at ¶¶ 2-4. However, the lab could not match the prints with anyone in its database. *See id.* Detective Robert Baron, who had "developed a personal interest in solving the Cookie Bandit burglaries,"

also saw reports in the case file about DNA evidence being submitted to the state crime lab.
Affidavit of Robert Baron, Defendants' Exhibit I (Doc. No. 72-9) ("Baron Aff.") at ¶¶ 4, 5.
Again, this evidence resulted in no matches in the national DNA database. *See id*. Morrison also
testified that while he believed the Cookie Bandit wore gloves when he broke in, he nonetheless
thought that "there had to have been at least five fingerprints gathered over a course of 200-and-
some-odd burglaries committed since 1998." Morrison Depo. Part 1 at 35:1-10. According to
Morrison, these prints were sent to the state crime lab, but as Captain Traxler also averred, no
identification resulted. *See* Morrison Depo. Part 3 at 26-29.

In March 2009, an email from a Jemez resident who was upset about the ongoing Cookie
Bandit burglaries prompted the state governor's office to send a letter to Juan Vigil, the Sandoval
County manager. Lucero Depo. Part 2 at 146-50. Vigil in turn forwarded the letter and email to
Trujillo and Lucero. *See id.* Lucero's response to Vigil described SCSO's ongoing efforts to
capture the Cookie Bandit, such as "implementing extra patrols . . . [and] set[ting] up in cabins
waiting for the suspect to commit a burglary." Letter from Tim Lucero to Juan Vigil, Plaintiffs'
Exhibit 41 (Doc. No. 98-41) ("Lucero Letter") at 2; *see also* Letter from Juan Vigil to Joanne S.
Dalton, Plaintiffs' Exhibit 42 (Doc. No. 98-42) ("Vigil Letter") at 1. Lucero also noted that
Moriarty and Harris, to whom he referred only as "two deputies," had been assigned to the Jemez
area "fulltime, which their main focus is the apprehension of the burglary suspect." Lucero Letter
at 2. Lucero wrote that "[t]he Sheriff's Office has no reports of violence by the suspect," but
Lucero also mentioned that one time the Cookie Bandit told residents who confronted him that he
had a gun, though the residents could not see whether he actually had any weapon. *Id.* at 1.
Lucero also indicated that when the Cookie Bandit mistakenly broke into an occupied cabin, he
would usually "quickly disappear[] into the forest." *Id*. Vigil adopted many of Lucero's

11

representations when Vigil responded to the concerned Jemez resident. *See* Vigil Letter.

**C.      The First Weeks of Moriarty and Harris' Cookie Bandit Operation**

In the spring of 2009, Moriarty was expecting to spend her summer with the Bernalillo Parks and Recreation department. *See* Moriarty Depo. at 140:4-20. Moriarty had a tentative plan to run a program in which she would teach kids how to sew and make a large quilt with a law enforcement theme. *See id.* at 140:19-141:14. Then, "out of nowhere," Harris came to Moriarty with the Cookie Bandit assignment. *Id.* at 140:8-11. Harris told Moriarty that the assignment came from Defendants—"that it was Captain Morrison's idea" for Harris and Moriarty to go to the Jemez to investigate the Cookie Bandit. *Id.* at 148:1-5.[7] Moriarty recalls Harris portraying the assignment to her as "a piece of cake, that there was nothing to be worried about, that [they] were going to get paid to go camping." *Id.* at 142:10-13. Regardless, Moriarty "wasn't all that excited" about the prospect of spending the summer camping and "didn't like the idea [of going after the Cookie Bandit] from the get-go." *Id.* at 143:10-12, 142:14-20. Moriarty thought the assignment "was odd, that it was something [she] had never done before." *Id.* at 140:12-13. Harris, though, was enthusiastic about camping in the Jemez for the summer. *See id.* at 143:13-23. Moriarty says she agreed to go along both because Harris was her supervisor and, as her friend, Harris persuaded her that the assignment might be good. *See id.* at 143:10-18, 144:8-19. Moriarty expressed some doubts and discomfort about the assignment to her partner, Garrabrant, as well as to Harris' wife and a few close friends. *See id.* at 145:5-146:6, 149-50; Deposition of Doug Garrabrant, Plaintiffs' Exhibit 19 (Doc. No. 98-19) ("Garrabrant Depo.") at 108:10-25.

_____

[7] Morrison and Lucero contend that Harris volunteered himself and Moriarty for the job. *See* Morrison Depo. Part 2 at 15-16; Lucero Depo. at 97-99. However, viewing the facts in the light most favorable to Moriarty, the Court will assume that Defendants assigned Moriarty and Harris to the Cookie Bandit investigation, rather than that Harris volunteered.

However, Moriarty never told these people or Harris, despite her close relationship with Harris, that she was scared about or felt totally unqualified for the assignment. *See id.* at 142:5-10, 145-47. Moriarty explains that she did not feel the need to say anything like this "[b]ecause [she] didn't know [she] was unprepared and . . . didn't know who [they] were after." *Id.* at 150:13-24; *see also* Garrabrant Depo. at 106:22-108:21.

After Harris came to Moriarty with the assignment, Moriarty met once with Morrison and Lucero about the assignment. *See* Moriarty Depo. at 152:11-155:11. Moriarty never spoke about the assignment with Trujillo. *See id.* at 152:19-21. Harris had met at least once previously with Morrison and Lucero about the assignment. *See* Morrison Depo. Part 3 at 15-17. Morrison testified that he told Harris everything that SCSO knew about the Cookie Bandit at that meeting, and that he told Moriarty the same at the meeting with her. *See id.* at 17-20. However, Moriarty remembers the meeting with Morrison and Lucero as being mostly "bantering about . . . what [Moriarty and Harris] were going to say [about] why [they] were" in the Jemez. Moriarty Depo. at 154:13-23. Moriarty does not remember Morrison or Lucero telling her anything about past threats of violence by the Cookie Bandit. *See id.* at 155:16-156:7. Rather, she says, Morrison and Lucero told Moriarty and Harris that they could take "[their] families and [their] dogs, it would make [the undercover operation] look more real." Moriarty Depo. at 154:16-20. Morrison showed Moriarty a photo of the Cookie Bandit and told her that the Cookie Bandit had been burglarizing cabins in the Jemez for years, and that the break-ins were growing "increasingly more destructive." *Id.* at 162:7-13. However, Moriarty says that at the meeting Morrison and Lucero "didn't talk about any of the dangers involved, or any kind of Plan B or anything." *Id.* at 154:15-23. As a result, Moriarty's impression throughout the summer, based mainly on what Harris told her, was that the Cookie Bandit was "[j]ust a cooky [sic] old man that lived like a

13

hermit in the woods, just an old nut, nothing to be afraid of." *Id.* at 151:3-12.

Moriarty and Harris began going to the Jemez area toward the end of May 2009, after the school year ended. *See id.* at 153:8-14. They worked there on the Cookie Bandit investigation on a full-time basis through mid-July. *See id.* at 153:8-154:8. Moriarty took breaks twice, once to go to a wedding in Maine and once, in early July, to go with Harris to a conference for SROs in Baltimore. *See id.* at 153:15-25.

Because Moriarty and Harris were supposed to be undercover, they decided to pretend they were a brother and sister from New York. *See id.* at 148:21-149:9. The two spent the first weeks of the summer "hik[ing] up to the hot springs . . . or go[ing] to the little dry goods store and . . . buy[ing] things and chitchat[ting] with" locals to blend in and further their cover story. *Id.* at 180:14-181:10. Moriarty and Harris tried to gather information about the Cookie Bandit, but did so mostly by "[h]iking up certain roads [and] looking at places where he had been seen" rather than asking too many people about the Cookie Bandit, since Moriarty and Harris "didn't want [the locals] to know that [Moriarty and Harris] were looking for [the Cookie Bandit] in particular, so [Moriarty and Harris would look like] just hanging-out tourists." *Id.* at 180-82.

Throughout the summer, Moriarty and Harris were in plainclothes, not wearing their uniforms or displaying their badges, though some of the full-time residents in the area knew that Moriarty and Harris were undercover police officers. *See* Interview of Deputy Theresa Moriarty, Defendants' Exhibit S (Doc. No. 108-4) ("Moriarty NMSP Interview Part 2") at 10-12. In particular, Moriarty and Harris spent time with two elderly couples who lived in the area and had experience with the Cookie Bandit, to "see if [the couples] had spotted him recently or anything like that, or heard anything," as well as "help[ing] [the couples] do things around the yard, . . . making it look like [Moriarty and Harris] were just there to visit and help." *Id.* at 182: 11-183:2.

One of the couples, the Hartys, had encountered the Cookie Bandit once, and reported to SCSO that he threatened them to "back off, he had a gun." Benally Depo. at 54:18-21, Baron Aff. at 3 ¶ 10. The Hartys also told Moriarty and Harris about the incident. *See* Moriarty Depo. at 167:19-21. Moriarty remembers the Hartys saying that when they saw the Cookie Bandit, he "was acting very nervous and strange and putting his hands inside his jacket, and [the Hartys] were afraid that he might have a gun." *Id.* at 168: 5-8. But when Mrs. Harty "came out with the camera, [the Cookie Bandit] ran," and the Cookie Bandit never brandished a gun. *Id.* at 168:5-17.

Moriarty also had heard from Harris that there was a "possibility" that the Cookie Bandit "had pointed a gun at a forestry official," but that it was not confirmed. *Id.* at 166:17-21. In conversations with Jemez residents, Moriarty had heard people say that they thought the Cookie Bandit was "a really bad dude." *See* Interview of Deputy Theresa Moriarty by James Mowduk, Defendants' Exhibit J (Doc. No. 72-10) ("Mowduk Interview Part 1") at 12-15. But Moriarty assumed that people were afraid of the Cookie Bandit only because the residents were mostly elderly and worried about being at home when he broke in. *See* Moriarty Depo. at 1-18.

Moriarty and Harris kept their RVs parked at Fenton Lake for the summer. *See id.* at 184:16-18. Sometimes Moriarty and Harris spent the night in the mountains, sleeping in their RVs, and sometimes they drove home, depending on Harris' preference. *See id.* at 184:16-185:3. At least once, Moriarty and Harris stayed up for part of the night in one of the RVs, watching for the Cookie Bandit with night vision goggles. *See id.* at 180:1-9. Another time, when Moriarty was on vacation, Harris and his father-in-law, who had a concealed-carry permit, stayed for part of a night in a cabin to see if the Cookie Bandit would break in. *See id.* at 229:4-8; Deposition of Tonia Harris, Plaintiffs' Exhibit 18 (Doc. No. 98-18) ("Harris Depo. Part 2") at 167:25-169:9.

At some point during the summer, Robert Baron, the SCSO detective who had previously

investigated the Cookie Bandit burglaries, visited Moriarty and Harris at Fenton Lake. *See* Baron Aff. at ¶¶ 9-10; Moriarty Depo. at 151:13-152:10. Baron mainly spoke with Harris, taking him out on trails where the Cookie Bandit may have been spotted and briefing Harris on what Baron had learned about the Cookie Bandit. *See* Baron Aff. at ¶ 10. Baron avers that he told Harris everything that Baron had learned about the Cookie Bandit, "including the incident with the Hartys, the report by Luke Dienlin of being shot and the fact that many believed the report was suspicious, the fact that the burglaries had become more destructive, the fact that the Cookie Bandit had eluded capture for perhaps eight years, and [Baron's] own belief that the burglar was armed, dangerous and would not submit to law enforcement orders." *Id.* Though Moriarty was in the Jemez when Baron visited, she "didn't really talk to Robert Baron" because Baron "went off with Joe." Moriarty Depo. at 151:13-152:6. As a result, Moriarty did not hear anything that Baron said about the Cookie Bandit's past threats and Baron's impression of the Cookie Bandit's dangerousness.[8] *See id.* at 151:13-15.

## D.   **The Bonwell Cabin Stakeout and Shooting**

In early July, Moriarty and Harris discussed holding a cook-out in the Jemez as part of their operation. *See id.* at 163:11-25. Moriarty and Harris planned to invite neighbors and buy groceries to stock a cabin with the aim of enticing the Cookie Bandit into breaking in when

---

[8]In an interview with a New Mexico State Police investigator six days after the shooting, Moriarty indicated that she knew of the incidents related by Baron, and more, even before the shooting. *See* Mowduk Interview Parts 1-3 (Doc. Nos. 72-10, 98-30, and 108-4). Moriarty argues that she talked with others at SCSO in the days immediately after the shooting and heard about these prior incidents with the Cookie Bandit, and that her remarks to the state police reflected this later-acquired knowledge. *See* PLAINTIFFS' COMBINED RESPONSE BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (Doc. No. 96) ("Summary Judgment Response") at 17, ¶ 33. Viewing the evidence in the light most favorable to Moriarty, the Court will assume that Moriarty knew or was vaguely aware of the few incidents involving the Cookie Bandit only as described in her deposition testimony.

Moriarty and Harris were waiting for him. *See id.* at 230:24-231:9. At a party on July 12, 2009,

Harris told Morrison of this plan, and that Harris felt that he and Moriarty "were getting closer

and that they were being watched." Morrison Depo. Part 4 at 81:10-22. During the same party,

Harris' wife heard Trujillo make a big display of telling Harris to "Take your wife. Take your

kids. Take your dog. . . . Keep having fun going up there," encouraging Harris in a somewhat

joking manner. Harris Depo. Part 2 at 152-55. Harris' wife also recalled that from the way Harris

described the cook-out plan to Morrison, Lucero, and Trujillo at the party, Harris made it clear

that he intended to talk loudly with neighbors about the cook-out the day before it happened. *See*

*id.* at 189-90. The "ruse" of the cook-out and stocking the cabin ahead of time was supposed to

lure the Cookie Bandit into the cabin on Wednesday night, when Moriarty and Harris would be

waiting for him and when the stakeout actually did take place. *Id.*[9] Morrison spoke again with

Harris several days later, telling Harris that Morrison "had talked [the cook-out plan] over with

[Lucero] and that it look[ed] like it might work and [Morrison would] put together a plan and

come up on Thursday [July 16, 2009] and see what [they] could do." *Id.* at 83:2-7.

      The planned July 16 cook-out never happened, since Moriarty and Harris carried out the

operation at issue on July 15. *See* Moriarty Depo. at 231:3-17. Sometime before July 15, Harris

told Moriarty that they would spend the night of July 15 in a cabin known as the Bonwell cabin.

*See id.* at 139:6-12, 229:4-8. Moriarty and Harris had not stayed overnight in a cabin any other

time during that summer. *See id.* at 139:13-15. Moriarty did not know why Harris decided to stay

---

      [9]Defendants deny that they knew Moriarty and Harris were going to be in the cabin
Wednesday night. *See* Motion for Summary Judgment at 14 ¶ 40. However, for the purposes of
summary judgment they do not dispute the claim. *See* Summary Judgment Reply at 11-12 ¶ 44.
In light of this stipulation, and viewing the factual allegations in the light most favorably to
Moriarty, the Court accepts that Defendants knew in advance that Moriarty and Harris would be
in the cabin on the night of July 15-16, 2009.

in a cabin on the night of July 15. *See id.* at 229:4-24. However, the day before the July 15 stake-out, Moriarty and Harris spoke with one of the Stones, who lived across from the Bonwell cabin. *See* Interview of Deputy Theresa Moriarty by James Mowduk, Defendants' Exhibit S (Doc. No. 108-4) ("Mowduk Interview Part 3") at 22-23. Harris told Moriarty that the Bonwell Cabin "was one of [the Cookie Bandit's] most frequent cabins he broke into," which made it a good choice for a stakeout. Moriarty Depo. at 232:3-10. The Stones knew that Moriarty and Harris were going to conduct the stakeout and allowed Moriarty and Harris to use their driveway to park their car. *See* Mowduk Interview Part 3 at 22-23. Moriarty thought the Stones also gave Harris the key they had to the Bonwell cabin. *See id.* at 23-24.

On July 15, Moriarty was at her home in Rio Rancho for part of the day and drove out to the Jemez with Harris in the afternoon. *See* Moriarty Depo. at 137-139. Moriarty was not feeling very well when they left, but when Moriarty expressed this to Harris, he made light of it, telling her to "'shut [her] piehole.'" *Id. at* 137:15-20. In any case, Moriarty "felt better when [they] got up into the cooler mountains." *Id.* at 138: 1-5. That night, Moriarty and Harris watched a movie with Harris' wife and daughter in Harris' RV at Fenton Lake. *See id.* at 185:4-9. Before the movie ended, Harris told Moriarty that they had to go start the stakeout. *See id.*; Deposition of Tonia Harris, Defendants' Exhibit M (Doc. No. 72-13) ("Harris Depo. Part 1") at 177:13-179:4.

As Moriarty and Harris were preparing to go to the cabin, which was at some distance from Fenton Lake, Moriarty realized that she had locked herself out of her RV. *See* Moriarty Depo. at 185-87, Harris Depo. Part 1 at 179:19-180:4. Moriarty had her service weapon (on which she had trained and qualified) and other equipment, including her handcuffs, cell phone and radio, in the RV. *See* Moriarty Depo. at 186:21-187:3; Harris Depo. Part 1 at 179: 23-180:17. Moriarty said to Harris that "maybe we should just go another time," but Harris wanted to continue with the plan.

18

Moriarty Depo. at 186:8-12. Harris told Moriarty not to "worry about it," that she could use his extra gun. *Id.* The two then left for the cabin. *See* Harris Depo. Part 1 at 181:5-12.

Once at the cabin, Moriarty and Harris did not turn on the lights, but Harris showed Moriarty around the cabin's few rooms. *See* Moriarty Depo. at 187:4-21. Harris called SCSO's dispatch center just after midnight on July 16, 2009 to provide his and Moriarty's location and to report the fact that they were going to stake out the cabin for the Cookie Bandit. *See* New Mexico Supplemental Report, Plaintiffs' Exhibit 22 (Doc. No. 98-22) ("NM Supp. Report") at 3; SCSO Internal Investigative Report by Jason Benally, Plaintiffs' Exhibit 27 (Doc. No. 98-27) ("SCSO Benally Report") at 1-2. Next, Moriarty took off her shoes and lay down on the bed. *See* Moriarty Depo. at 187:6-188:21. Harris ate something in the kitchen, then crawled over Moriarty to the other side of the bed, where he fell asleep. *See id.* at 188:24-189:7. Moriarty and Harris dozed off and on for a couple of hours. *See id.* at 189.

At some point in the early hours of the morning, Harris touched Moriarty's shoulder and said "He's here," because Harris had apparently heard someone start to break in. *Id.* at 190:16-19. Moriarty told Harris to "wait for [the Cookie Bandit] to get all the way in" before doing anything. *Id.* at 191:11-13. Once Moriarty and Harris heard that the Cookie Bandit was inside, they left the bedroom "with [their] guns drawn and [their] little flashlights on" to confront the burglar. *Id.* at 192:5-11. Moriarty and Harris said to the Cookie Bandit, "Police. Don't move," and "Turn around, put your hands behind your back." *Id.* at 192:11-13. The Cookie Bandit did not comply, and instead attacked Moriarty and Harris. *See id.* at 192:14-19. Moriarty and Harris struggled for twenty to thirty minutes with the Cookie Bandit, exchanging fierce punches and kicks with him. *See id.* at 192-196. Finally, Moriarty and Harris managed to hold the Cookie Bandit down long enough for Moriarty to handcuff him. *See id.* at 196:24.

After Moriarty handcuffed the Cookie Bandit, Harris told Moriarty to "get the radio and call for backup," and Moriarty got up to follow orders. *Id.* at 199:17-200:3. The Cookie Bandit continued struggling, forcing Harris to keep pushing him down. *See id.* at 197:3-9. However, Harris then got up too, leaving the Cookie Bandit on the floor. *See id.* at 201-03. Moriarty was turned away, but thinks Harris must have walked to his backpack, which held a John Doe arrest warrant. *See id.* at 202-04; SCSO Supp. Report at 3. When Harris was up, he and Moriarty briefly high-fived each other in congratulations. *See* Moriarty Depo. at 202:15-25; Interview of Deputy Theresa Moriarty by James Mowduk, Plaintiffs' Exhibit 30 (Doc. No. 98-30) ("Mowduk Interview Part 2") at 48. Moriarty had not patted down the Cookie Bandit after handcuffing him, because Harris had told her to get the radio. *See* Moriarty Depo. at 199:15-200:3. Moriarty did not see Harris pat down the Cookie Bandit, either. *See id.* at 200:4-14.

Just after Moriarty called the SCSO dispatch center with her number and location, and as Harris turned around with the warrant in his hand, the Cookie Bandit began firing with a gun that he had somehow retrieved from his person or from where it had fallen out on the floor while he struggled with Moriarty and Harris. *See* Mowduk Interview Part 2 at 48-52; Moriarty Depo. at 208:21-209:4. The first two shots hit Harris, who cried out to Moriarty that he was hit and told her to shoot the Cookie Bandit. *See* Mowduk Interview Part 2 at 52-53; Moriarty Depo. at 205-06. Moriarty then stepped in front of Harris, trying to shoot the Cookie Bandit with the gun that Harris had loaned her. *See id.* Perhaps because of the loaned gun's "extremely hard and unusual trigger pull," as well as Moriarty's unfamiliarity with the gun, she could not get the gun to fire. NM Supp. Report at 16; Moriarty Depo. at 205-207. The Cookie Bandit continued to shoot, but the final three bullets from his gun narrowly missed Moriarty. *See id.* Harris then took the gun from Moriarty and shot the Cookie Bandit, killing him. *See* Mowduk Interview Part 2 at 49.

Harris was bleeding profusely, so Moriarty tried to stanch the blood while also calling on the radio to get help. *See id.* at 58, 66. However, the radio worked only intermittently, and those on the receiving end in the dispatch office could not hear much of what Moriarty was saying. *See id.*; SCSO Benally Report at 2. Lt. Dameron, who was an on-duty Lieutenant Supervisor for the relevant hours, also heard Moriarty, noted the distress in her voice, and began responding. *See* Deposition of Walter Chris Dameron, Defendants' Exhibit R (Doc. No. 108-3) ("Dameron Depo. Part 3") at 82-85. Dameron quickly learned from the dispatcher that Harris had been shot. *See* Dameron Depo. Part 3 at 85-89. Dameron immediately ordered help to go out to Moriarty and Harris, though Moriarty apparently received no indication that this would happen. *See id.*; Mowduk Interview Part 2 at 58-59. Moriarty continued trying to call on the radio, but heard no response other than someone calling out Moriarty's unit number. *See* Mowduk Interview Part 2 at 58. Moriarty could not use a phone because cellphone service in the area on SCSO's new provider network was close to non-existent, and the cabin had no land line. *See* Benally Depo. at 136:13-137:8; Elder Report at 9; *see also* Interview of Lt. Chris Dameron, Plaintiffs' Exhibit 37 (Doc. No. 98-37) (describing generally deplorable conditions for police communications in the Jemez).

At one point, Moriarty ran outside and turned all the cabin's lights on, screaming for help and hoping that the neighbors would hear. *See* Mowduk Interview Part 2 at 58, 66. The SCSO deputy closest to the cabin was some fifty miles away. *See* Moriarty Depo. at 210:5-13. Lt. Dameron, who was on supervisory duty back near Albuquerque, had no idea that Moriarty and Harris were conducting the stake-out, much less where the cabin was, though he "knew it would take a good amount of time to get there." Dameron Depo. at 82-85. Finally, assistance did arrive at the cabin. *See* Mowduk Interview Part 2 at 68. Harris was airlifted to the University of New Mexico Hospital in Albuquerque, but he died en route. *See* NMSP Report at 1, 5; at 4. Moriarty

sustained injuries from the long fight with the Cookie Bandit before he was handcuffed, as well as severe trauma, forcing her to leave her job with SCSO. *See* Moriarty Depo. at 111-12.

Once the Cookie Bandit's fingerprints were taken from his corpse, his true identity was discovered: he was Joseph Henry Burgess, a man wanted for a Canadian couple's 1979 murder and a suspect in another double homicide in California. *See* Summary Judgment Response at 4.

## DISCUSSION

**A.**   <u>**Motion to Exclude Certain Opinions in the Van Blaricom Report**</u>

Defendants moved to exclude certain opinions in the report by Plaintiffs' retained expert on police procedures, D.P. Van Blaricom (the "Van Blaricom Report") on the basis that the opinions do not meet the standard of admissibility for expert opinions. *See* Motion to Exclude Van Blaricom at 1. Defendants also asked the Court to disregard the Van Blaricom Report entirely because when Plaintiffs originally filed the Van Blaricom Report, it was "not in an affidavit or sworn testimony," and so "is inadmissible hearsay that is not competent evidence to rebut a motion for summary judgment." REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' 42 U.S.C. § 1983 CLAIM AND STATE TORT CLAIMS (Doc. No. 108) ("Summary Judgment Reply") at 4.

**1.**   **The Van Blaricom Report**[10]

Mr. Van Blaricom lives in Washington State and has a background in law enforcement

---

[10]Mr. Van Blaricom revised his report several times; Plaintiffs attached the newest report to the RESPONSE TO DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF PROPOSED EXPERT D.P. VAN BLARICOM (Doc. No. 85) ("Van Blaricom Response"). Defendants then updated their references to the Van Blaricom Report. *See* Summary of Van Blaricom Second Amended Report Opinions, Defendants' Exhibit A to the Van Blaricom Reply (Doc. No. 99-1) ("Van Blaricom Summary"). Therefore, the Court will refer to the version of the Van Blaricom Report that was filed with Plaintiffs' Van Blaricom Response (Doc. No. 85-1).

and administration. Mr. Van Blaricom's experience includes twenty-nine years with the police department in Bellevue, Washington, with eleven of those years spent as the Chief of Police. In Mr. Van Blaricom's work with the Bellevue Police Department, he created numerous model programs and co-authored Washington's Standards on Internal Discipline of Law Enforcement Agencies. Mr. Van Blaricom has also served on various committees to advise governing bodies on law enforcement matters. For the past twenty-six years, Mr. Van Blaricom has served as a police practices consultant in over 1,700 lawsuits alleging police liability around the country.

Mr. Van Blaricom makes numerous findings and assertions in his report. Defendants move the Court to exclude certain specific opinions in the Van Blaricom Report. *See* Van Blaricom Summary. The Court will only address those opinions that are relevant to Defendants' Motion for Summary Judgment, namely:

(1) "There had been an excellent opportunity to positively identify [the Cookie Bandit], when his campsite was discovered in 2008 [because] a "*considerable amount of* (stolen) *property was recovered*," which undoubtedly had trace evidence of the suspect's latent prints thereon . . . [and] even a single partial latent print would had [sic] been sufficient to identify suspect." Doc. No. 85-1, ¶ 8h (emphasis in original).

(2) "Based upon my training, experience and a careful evaluation of the totality of circumstances in this matter, it is my considered professional opinion that SCSO Sheriff Trujillo, Undersheriff Lucero and Captain Morrison shockingly combined to place plaintiff at extreme risk."*Id.* at ¶ 9.

(3) "Even a casual review of the foregoing standards of care [as provided in the National Law Enforcement Policy Center's Model Policy on "Stakeouts"], when compared with the indisputable facts of this "*stakeout*," reveals such a deliberate disregard of

professional planning and execution as to be literally shocking." *Id.* at ¶ 9g.

(4) "Sheriff Trujillo, Undersheriff Lucero and Captain Morrison knew or should have known of those blatant deficiencies in both their plan and plaintiff's qualification to participate therein but deliberately disregarded those facts with foreseeable results." *Id.* at ¶ 9j.

(5) "The tragic outcome of this debacle was reasonably foreseeable and should come as no surprise to **ANY** reasonably experienced law enforcement officer and/or police practices expert." *Id.* at ¶ 10f (emphasis in original).

## 2.     The Court Will Not Exclude the Van Blaricom Report On The Basis That The Originally Filed Report Was Not Sworn

After Plaintiffs belatedly realized that they had not filed a sworn version of the Van Blaricom Report, Plaintiffs filed a NOTICE OF SUPPLEMENTATION OF PLAINTIFFS' RESPONSE BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (Doc. No. 111) ("Notice of Supplementation"). Plaintiffs attached an affidavit signed by Mr. Van Blaricom swearing that he prepared the Van Blaricom Report and its exhibits, and that the report and exhibits reflected "the truth to the best of [his] knowledge." RULE 56(e) AFFIDAVIT OF PLAINTIFFS' POLICE PROCEDURES EXPERT D.P. VAN BLARICOM (Doc. No. 111-1) ("Rule 56(e) Affidavit"). Defendants then filed their Objection, arguing that neither Plaintiffs' Notice of Supplementation nor the Rule 56(e) Affidavit complies with relevant procedural rules, and that the Court should therefore consider neither document. And because without the accompaniment of the Rule 56(e) Affidavit the Van Blaricom Report would be unsworn hearsay, Defendants contend that the Court should not consider any part of the Van Blaricom Report, much less the opinions to which Defendants object.

24

Specifically, Defendants note that although Plaintiffs purported to file the Notice of Supplementation and Rule 56(e) Affidavit in accordance with Federal Rule of Civil Procedure 56(e), that rule "clearly contemplates that the party who desires to act under Rule 56(e) must move the Court for permission to make" such a filing, and opposing parties may then respond. Objection at 3. Also, Defendants argue that the Local Civil Rules of the United States District Court for the District of New Mexico ("Local Rules") permit supplementation "only in the limited circumstance in which it is required to provide supplemental authority to the Court after the party's brief has been filed." *Id.* at 4 (citing D. N.M. L.R.-Civ. 7.8). Further, Defendants note that under the Local Rules "[s]ur-replies are specifically disallowed, except with leave of the Court," and that Plaintiffs did not obtain leave to file a sur-reply. *Id.* (citing D. N.M. L.R.-Civ. 7.4(b)). Finally, Defendants point out that the Local Rules require movants to determine whether a motion is opposed, and Plaintiffs did not contact Defendants about Defendants' position on the Notice of Supplementation before filing it. *See id.* at 5 (citing D. N.M. L.R.-Civ. 7.1(a)). Defendants contend that Plaintiffs' Notice of Supplementation is really a motion, and that because Plaintiffs did not make a good-faith request of Defendants before filing, the "filings should be stricken from the record." *Id.*

Plaintiffs respond that their failure to submit a sworn version of the Van Blaricom Report was an "inadvertent error," and that they "acted in good faith and accordance with Fed. R. Civ. P. 56(c) and (e)" when they filed the Notice of Supplementation and the Rule 56(e) Affidavit. PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTION TO PLAINTIFFS' NOTICE OF SUPPLEMENTATION (Doc. No. 114) ("Response to Objection") at 1. Plaintiffs' Notice of Supplementation, including the Rule 56(e) Affidavit, aimed to address the problem caused by the unsworn Van Blaricom Report by demonstrating that Mr. Van Blaricom swears to his report's

contents. In response to Defendants' argument that the Notice of Supplementation does not comply with Rule 56(e), Plaintiffs argue that the rule's plain language does not require parties to request permission to file, and that courts have addressed Rule 56(e)'s requirements for filing a supplement "on an ad hoc basis." Response to Objection at 4. As for Defendants' arguments about Plaintiffs' failure to comply with the Local Rules, Plaintiffs contend that the Notice of Supplementation is in no sense a "motion" or "surreply" and, accordingly, that Plaintiffs did not need to seek Defendants' position on the Notice of Supplementation. *Id.* at 7.

The Court agrees with Plaintiffs. As Plaintiffs point out, the Notice of Supplementation and Rule 56(e) Affidavit acted as a "simple verification" of the Van Blaricom Report's contents, and did not attempt to "supplement[] [Plaintiffs'] response with any substantive argument in support of D.P. Van Blaricom's report or opinions" that called for a response from Defendants or hindered Defendants' ability to make arguments about the Van Blaricom Report's admissibility on the merits. Response to Objection at 2. Neither Rule 56(e)'s plain language nor the case law interpreting Rule 56(e) require Plaintiffs to request permission from the Court to file a document that corrects an essentially clerical mistake. The Court also does not construe Plaintiffs' Notice of Supplementation as a motion requiring any additional actions under the Local Rules. Finally, the Court is not convinced by Defendants' argument that they have been prejudiced because, since they believed that the originally unsworn Van Blaricom Report "was inadmissible . . . , [Defendants did not need] to address the substantive deficiencies of the [Van Blaricom Report] in their [Summary Judgment] Reply." *Id.* at 7. Defendants address the "substantive deficiencies" of the Van Blaricom Report at length in their Motion to Exclude Van Blaricom. The Court's mere willingness to consider the Van Blaricom Report will in no way "result[] in a *de facto* determination that Van Blaricom's opinions are substantively admissible," as Defendants seem

to fear. *Id.* Plaintiffs' counsel is advised to be more cautious in ensuring that expert reports they file in the future are properly sworn and authenticated at the time of filing. However, because Defendants have had a full opportunity to air their concerns about the general admissibility of Mr. Van Blaricom's opinions, and because Plaintiffs have not clearly failed to comply with the relevant rules of procedure, the Court finds no reason to refuse to consider the Van Blaricom Report at all, as Defendants suggest in the Summary Judgment Reply and request in the Objection. Therefore, the Objection will be denied.

**3.      Standard for Admissibility of Expert Witness Testimony**

Federal Rule of Evidence 702, which governs the admissibility of expert witness testimony, states that:

> [a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Plaintiffs, as proponents of the expert, bear the burden of satisfying Rule 702 and establishing the testimony's admissibility. *See United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (en banc). In applying Rule 702, a district court acts as a "gatekeeper" to ensure proffered testimony's relevance and reliability. *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (citing *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 589 (1993)). The court fulfills its initial Rule 104 obligation by conducting a preliminary inquiry into an expert's qualifications and admissibility of proffered evidence. *See* Fed. R. Evid. 104(a) ("The court must decide any preliminary question about whether a witness is qualified . . . or evidence is admissible.").

27

The district court's determination of an expert opinion's admissibility involves a two-step analysis. First, the court must "determine whether the expert is qualified 'by knowledge, skill, experience, training, or education' to render an opinion." *Nacchio,* 555 F.3d at 1241 (quoting Fed. R. Evid. 702). If the court finds that "the expert is sufficiently qualified, then 'the court must determine whether the expert's opinion is reliable by assessing the underlying reasoning and methodology.'" *United States v. Avitia-Guillen*, 680 F.3d 1253, 1256 (10th Cir. 2012), *cert. denied*, 133 S. Ct. 466 (2012) (quoting *Nacchio,* 555 F.3d at 1241).

Rule 702 grants the trial judge broad discretion in deciding reliability. *See Kumho Tire*, 526 U.S. at 152. In *Daubert*, the Supreme Court provided a non-exhaustive set of factors for the district court to consider in determining whether proposed expert testimony is based on reliable methods and principles: (1) whether the particular theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) known or potential rate of error; (4) existence and maintenance of standards controlling the technique's operation; and (5) whether the technique is generally accepted in the relevant scientific or expert community. *See* 509 U.S. at 593-94. But while a district court may consider *Daubert*'s factors when determining admissibility of expert testimony, "the test . . . is flexible, and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case. Rather, the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire*, 526 U.S. at 141-42. In this light, the Court is also mindful that it should liberally admit expert evidence. *See United States v. Gomez*, 67 F.3d 1515, 1526 (10th Cir. 1995).

**4.      Application of Expert Witness Standard to Opinions in the Van Blaricom Report**

Defendants do not contend that Mr. Van Blaricom is not "qualified as an expert by

knowledge, skill, experience, training, or education," and based on the Court's review of Mr. Van Blaricom's credentials, the Court agrees that Mr. Van Blaricom passes muster as an expert under the first step of the two-part test. Fed. R. Evid. 702. Therefore, the Court will immediately move to the test's second part. Though Defendants and Plaintiffs both argue extensively in their briefing about various rationales for the Court to exclude or permit certain opinions in the Van Blaricom Report, the Court concludes that the five specific opinions listed above should be excluded because they simply do not meet Rule 702's requirements that an expert's opinions be "the product of reliable principles and methods" and that "the expert . . . reliably applied [those reliable] principles and methods to the facts of the case." Rather, the five opinions are either excessively speculative or attempt to provide legal conclusions, going so far as to track the state-created danger standard's language in a way that would impermissibly usurp the jury's role.

Although experts may extrapolate from the evidence, pure speculation is not permitted in expert testimony. *See Goebel v. Denver & Rio Grande W. R.R. Co.*, 215 F.3d 1083, 1088. This is because speculation, even by a good expert, is not a use of "reliable principles and methods." *See id.*; Fed. R. Evid. 702. The Court agrees with Defendants that Mr. Van Blaricom's speculation that the property that SCSO obtained from the Cookie Bandit's campsite must have had at least a single latent print, and that such a print would have been enough to obtain the Cookie Bandit's true identity from a national database, is this kind of unreliable, inadmissible speculation. *See* Motion to Exclude Van Blaricom at 12-13. The Court finds this to be true especially in light of considerable testimony about attempts by SCSO to take prints from Cookie Bandit crime scenes, and in light of the fact that the Cookie Bandit's camp site was outdoors and subject to harsh and variable weather conditions. Supposing otherwise is simply speculation: there is certainly no guarantee, as Mr. Van Blaricom suggests there is, that a latent print could have been recovered

and led to the earlier identification of the Cookie Bandit's true name.

Similarly, the other four opinions by Mr. Van Blaricom that are at issue are not reliable in the sense required by Rule 702 and cases interpreting it, because as Defendants note, the opinions merely apply key words from the legal standards at issue in the case to Defendants' actions. *See* Motion to Exclude Van Blaricom at 14-15. "The [Federal ]Rules [of Evidence] do not . . . allow an expert to offer testimony that merely tells the jury what result they should reach or testimony phrased in terms of "inadequately explored legal criteria." *United States v. Simpson*, 7 F.3d 186, 188 (10th Cir. 1993) (quoting Fed. R. Evid. 704 adv. comm. note). By the same token, "an expert may not state his or her opinion as to legal standards nor may he or she state legal conclusions drawn by applying the law to the facts." *Okland Oil Co. v. Conoco Inc.*, 144 F.3d 1308, 1328 (10th Cir. 1998) (citing *A.E. ex rel. Evans v. Indep. Sch. Dist. No. 25*, 936 F.2d 472, 476 (10th Cir. 1991)). When an expert attempts to provide the jury with legal terms of art and conclusions, without explaining those terms or giving the jury an opportunity to draw its own inferences, the expert's testimony is not "helpful" to the jury in the manner required by Rule 704, because the testimony "provid[es the jury] with no independent means by which it can reach its own conclusion or give proper weight to the expert testimony." *Simpson*, 7 F.3d at 188-89 (citing *Karns v. Emerson Elec. Co.*, 817 F.2d 1452, 1459 (10th Cir. 1987) (expert's testimony was grounded in sufficient detail to allow jury to make independent judgment). An alternative objection to this kind of conclusory testimony couched in legalese is that it usurps the jury's role as factfinder. *See Simpson*, 7 F.3d at 188 (citing *Specht v. Jensen*, 853 F.2d 805, 808 (10th Cir. 1988) (en banc), *cert. denied*, 488 U.S. 1008 (1989) (expert would usurp jury's role because his testimony would be to an "array of legal conclusions touching upon nearly every element of the plaintiff's burden of proof")). Either way, the testimony is inadmissible.

Plaintiffs contend that the opinions in question would be helpful and would not usurp the jury's role because Mr. Van Blaricom "will not testify as to whether the defense witnesses are credible, but rather whether the actions of Defendants conformed to standard police practices." Van Blaricom Response at 20. However, the opinions at issue do far more than conclude that Defendants' actions did not conform to standard practices. Rather, the opinions purport to tell the jury that Defendants "shockingly combined to place plaintiff at extreme risk," behaved with "deliberate disregard" that was "literally shocking," and "should have known" certain things that would have made the outcome of the Cookie Bandit operation "reasonably foreseeable." Van Blaricom Report at ¶¶ 9-10. Contrary to Plaintiffs' assertions, these statements and phrases comprise nothing if not legal conclusions, and also appear to be based on speculation not rooted in the undisputed facts of the case.

It is true, as Plaintiffs point out, that Mr. Van Blaricom is not a lawyer like the expert whose testimony providing legal conclusions the Tenth Circuit excluded in a 1988 case. *See* Van Blaricom Response at 19 (citing *Specht*, 853 F.2d 805). But despite his lack of formal legal training, Mr. Van Blaricom's status at trial as an expert of any sort is likely to influence the jury to give credence to his opinions, including those that incorporate terms and elements from the legal standards. at issue in this case. Therefore, the five specific opinions listed above are excludable for several reasons. Rather than reliably applying accepted methods to the facts, the five opinions simply speculate or provide legal conclusions. Additionally, the opinions' influence over the jury would be unfairly prejudicial to Defendants in violation of Federal Rule of Evidence 403. Thus, the Court will not consider those five opinions in its analysis of Defendants' Motion for Summary Judgment, and will grant Defendants' Motion to Exclude Van Blaricom in part. The Court declines to rule on the remainder of the Motion to Exclude Van

31

Blaricom, as it is not relevant to the Motion for Summary Judgment; admissibility of the other opinions to which Defendants object will be left for the state court to decide.

**B.    Motion for Summary Judgment on Moriarty's § 1983 Claim**

**1.    Summary Judgment Standard of Review**

Summary judgment is proper if, after drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Usually, the moving party bears the burden of showing that the case's material facts are undisputed and the nonmoving party cannot make a sufficient showing on an essential element of her claim. *See id.* at 322-23; *see also Justice v. Crown Cork & Seal Co., Inc.*, 527 F.3d 1080, 1085 (10th Cir. 2008); *Shero v. City of Grove*, 510 F.3d 1196, 1200 (10th Cir. 2007). But when, as here, "a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009) (citing *Pearson v. Callahan,* 555 U.S. 223, 227 (2009)).

The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party. *See Fowler v. United States*, 647 F.3d 1232, 1237 (10th Cir. 2011). However, each party's version of the facts must find support in the record, so if the parties tell different stories, and one party's story is "contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts." *Scott v. Harris,* 550 U.S. 372, 380 (2007); *see also Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1312 (10th Cir. 2009). Furthermore, if the moving party meets its burden, the nonmoving party must then show through the presentation of admissible evidence that specific facts exist

creating a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986);

*Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002).

**2. The Court Will Not Apply An Inference of Spoliation**

Moriarty argues that the Court should view evidence she sets forth about the destruction

of documents at the end of Trujillo's tenure as SCSO sheriff as supportive of an inference of

spoliation. *See* Summary Judgment Response at 33. Moriarty contends that this inference of

spoliation, if combined "with some (not insubstantial) evidence for [her] cause of action, [could]

allow [her] to survive summary judgment." Summary Judgment Response at 33 (quoting *Byrnie

v. Town of Cromwell Bd. of Educ.*, 243 F.3d 93, 107 (2d Cir. 2001)). However, as Defendants

point out, Moriarty identifies no specific, relevant documents that she believes were destroyed.

*See* Summary Judgment Reply at 14. The Court agrees with Defendants that all the evidence that

Moriarty presents to support the spoliation inference is either hearsay or fatally nonspecific. *See*

Summary Judgment Response at 28. This "evidence" is also fully contradicted by Trujillo's

sworn statement that he "absolutely did not remove or destroy any documents or materials

pertaining in any way to the Cookie Bandit case, the investigations into the Cookie Bandit

burglaries or the shooting of Sgt. Harris," as well as by current Sheriff Douglas C. Wood's

statement that although he had heard rumors of Trujillo destroying documents, he "had no

information then and do[es] not have any now that Sheriff Trujillo or anyone else destroyed

documents related to the Cookie Bandit matter." Affidavit of John Paul Trujillo, Defendants'

Exhibit 5 to Supplemental Brief (Doc. No. 118-5); Affidavit of Douglas C. Wood, Defendants'

Exhibit 4 to Supplemental Brief (Doc. No. 118-4). Crucially, Moriarty also alleges no "causal

relationship between any hypothetical spoliation and [Moriarty's] ability to prove [her] claim,

one of the essential elements [of spoliation] under New Mexico law." Summary Judgment Reply

at 28 (citing *Torres v. El Paso Elec. Co.*, 1999-NMSC-029, 127 N.M. 729, 744, 987 P.2d 386,

401. Though Moriarty has not actually moved for spoliation sanctions, the Court finds that the

vagueness of her allegations and the lack of any alleged causal relationship between suspected

spoliation and Moriarty's case are fatal to even an inference of spoliation.

**3. Law on Section 1983 State-Created Danger Claims**

As noted, Defendants have asserted qualified immunity as a defense, so Moriarty must

establish that her constitutional rights were violated, as well as that those constitutional rights

were, at the time of the alleged violation, "clearly established." *Martinez*, 563 F.3d at 1088.

Moriarty asserts that Defendants violated her rights protected by the Fourteenth Amendment's

Due Process clause. The Due Process clause protects an individual's life, liberty, and property

against government actions, but it does not normally require the state to protect individuals

against invasion of those rights by private actors. *See Daniels v. Williams,* 474 U.S. 327, 331

(1986); *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989). More

specifically, and relevant to this case, the Supreme Court has held that "[n]either the text nor the

history of the Due Process Clause supports [a] claim that the governmental employer's duty to

provide its employees with a safe working environment is a substantive component of the Due

Process Clause. . . . The Due Process Clause is not a guarantee against incorrect or ill-advised

personnel decisions. Nor does it guarantee municipal employees a workplace that is free of

unreasonable risks of harm." *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 126-29

(1992) (quotation marks and citations omitted).

However, two exceptions exist. Under the "special relationship" exception, state officials

may be liable for private parties' actions when the state has assumed a special relationship with

and control over an individual. *See Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist.*, 511

F.3d 1114, 1126 (10th Cir. 2008). Under the "state-created danger" exception, state officials can be liable for the acts of private parties when those officials themselves created the danger that harmed the complaining individual. *See Christiansen v. City of Tulsa*, 332 F.3d 1270, 1281 (10th Cir. 2003). Plaintiffs argue that the state-created danger exception applies here.

To determine whether this exception applies, the Tenth Circuit employs a six-part test that requires a demonstration that:

> (1) the charged state entity and the charged individual actors created the danger or increased plaintiff's vulnerability to the danger in some way;
> (2) plaintiff was a member of a limited and specifically definable group;
> (3) defendant['s] conduct put plaintiff at substantial risk of serious, immediate, and proximate harm; (4) the risk was obvious or known;
> (5) defendants acted recklessly in conscious disregard of that risk; and
> (6) such conduct, when viewed in total, is conscience shocking.

*Estate of B.I.C. v. Gillen*, 702 F.3d 1182, 1189 (10th Cir. 2012) (quoting *Christiansen*, 332 F.3d at 1281 (10th Cir. 2003)). The test also has two preconditions: that any conduct involved must have been affirmative conduct, and that the harm committed was private (i.e., third party, non-state-actor) violence. *See Gray v. Univ. of Colo. Hosp. Auth.*, 672 F.3d 909, 920 n. 8 (10th Cir. 2012) (noting that courts tend to overlook the preconditions when applying the six factors). In a recent case, the Tenth Circuit offered a "history lesson" on the state-created danger exception, making it clear that it is truly an *exception*: that is, a narrow basis on which, if every element is proven, state actors can be sued for harm caused by a third party. *Id.* at 921. The exception is not a remedy available as a matter of course, but rather "a means by which a state actor might be held liable for an act of private violence . . . under narrowly prescribed circumstances bearing upon conduct, causation, and state of mind, *provided* the danger the state actor created . . . precipitated a deprivation of life, liberty, or property in the constitutional sense." *Id.* at 921-22 (emphasis in original). Furthermore, to survive summary judgment, Moriarty must present evidence showing a

genuine issue of material fact as to *each* of the test's six elements. If Moriarty cannot satisfy even one of the factors, or cannot demonstrate a genuine dispute over material fact with regard to a factor, then summary judgment in favor of Defendants will be proper.

**4. Application of State-Created Danger Standard to Moriarty's Case**

Defendants contend that Moriarty cannot satisfy the state-created danger test's first, third, fifth, or sixth elements, and that she therefore cannot prove that Defendants violated her Due Process rights. The parties briefed each of the disputed elements; however, because the Court finds that Moriarty cannot satisfy the first or sixth prongs of the test—i.e., that Defendants acted affirmatively to endanger Moriarty, or that any of their actions or omissions actually "shock the conscience"—the Court will not address the other prongs. Failure to satisfy any of the prongs would doom Moriarty's claim, but the first and sixth prongs are at the heart of the state-created danger test, which is to show that Defendants took actions with "either actual wrongful intent or recklessness that is sufficiently egregious to shock the conscience." *Thayer v. Washington Cnty. Sch. Dist.*, 858 F. Supp. 2d 1269, 1274 (D. Utah 2012) (citing *Archuleta v. McShan,* 897 F.2d 495, 499 (10th Cir. 1990)). The undisputed facts of this case, even when viewed in the light most favorable to Moriarty, do not amount to a scenario in which Defendants acted affirmatively and culpably—that is, so recklessly and egregiously to harm Moriarty that the conscience is shocked. Therefore, Moriarty's due process claim must fail.

> *a. Whether Defendants Acted Affirmatively In Creating the Danger or Increasing Moriarty's Vulnerability to the Danger*

As noted, a precondition to the state-created danger test is a showing of some relevant "affirmative conduct" by the state actors who allegedly placed the plaintiff in danger. *See, e.g., Graham v. Indep. Sch. Dist. No. I-89*, 22 F.3d 991, 995 (10th Cir. 1994). Even "inaction by the

state in the face of a known danger is not enough to trigger the obligation" to protect a person against private violence, unless the State "limited in some way the liberty of [that person] to act on his own behalf." *Id.* Not only must the conduct be affirmative, it must, taking into account the second and third factors of the state-created danger test, be "conduct that imposes an immediate threat of harm, which by its nature has a limited range and duration. . . . Moreover, the conduct should be directed at a discrete plaintiff rather than at the public at large." *Ruiz v. McDonnell,* 299 F.3d 1173, 1183 (10th Cir. 2002). And in addition to requiring a showing of the affirmative nature of the state actor's actions, the Tenth Circuit requires that a state-created danger plaintiff "'show that the state acted with the requisite degree of culpability in failing to protect the plaintiff.'" *Uhlrig v. Harder*, 64 F.3d 567, 572-73 (10th Cir. 1995) (quoting *Leffall v. Dallas Indep. Sch. Dist.*, 28 F.3d 521, 531 (5th Cir. 1994)). To reach that degree of culpability, and to be liable under § 1983 as a result, the state actor's actions must have risen above negligence into the realm of at least recklessness. *See Sutton v. Utah State Sch. for Deaf & Blind*, 173 F.3d 1226, 1238 (10th Cir. 1999) (quoting *Uhlrig,* 64 F.3d at 573)

　　Moriarty tries to satisfy the state-created danger test's first prong and affirmative conduct requirement by couching Defendants' actions and nonactions as "purposeful[] fail[ures]." *See* Summary Judgment Response at 37. Moriarty argues that "[b]y purposefully failing to put a tactical plan in place for the operation; purposefully failing to inform Plaintiff Moriarty about violence perpetrated by the Cookie Bandit; purposefully selecting Moriarty and Harris, primarily school resource officers, for the operation; purposefully failing to provide backup by other officers; and purposefully failing to ensure reliable communication was available to Moriarty and Harris, Defendants violated . . . Moriarty's substantive due process rights." *Id.* Essentially, Moriarty claims that Defendants "failed to take any steps necessary to reasonably ensure

[Moriarty's] safety" and "chose to deliberately withhold information from Plaintiff Moriarty about the specific facts known to them which illustrated the truly violent propensities of the Cookie Bandit, instead encouraging the belief that the Cookie Bandit was merely a nuisance, not a threat to life." PLAINTIFFS' SUPPLEMENTAL BRIEF CONCERNING ISSUES RAISED BY COURT AT PRE-TRIAL CONFERENCE (Doc. No. 119) ("Plaintiffs' Supplemental Brief") at 4. Moriarty also depicts some of Defendants' failures to act as "refusals" to act, in line with what the Tenth Circuit has held is sufficiently affirmative conduct. *See* Plaintiffs' Supplemental Brief at 4-5 (quoting *Estate of B.I.C.*, 702 F.3d at 1188).

The Court agrees that some of Defendants' actions were sufficiently affirmative to satisfy the state-created danger test, but finds that those actions nonetheless amounted to no more than negligence under the circumstances, and certainly do not demonstrate the "requisite degree of culpability" required in the Tenth Circuit. *Uhlrig*, 64 F.3d at 573. Moriarty does not claim that Defendants actually intended to endanger or harm her, so she must show that Defendants were reckless in their actions, in order for the Court to find that they acted with such culpability. *See Sutton*, 173 F.3d at 1238. The Tenth Circuit has defined a reckless act as one that "reflects a wanton or obdurate disregard or complete indifference to risk," with reckless intent established when it can be proven that the state "actor was aware of a known or obvious risk that was so great that it was highly probable that serious harm would follow and he or she proceeded in conscious and unreasonable disregard of the consequences." *Medina v. City and Cnty. of Denver*, 960 F.2d 1493, 1496 (10th Cir. 1992). "[R]ecklessness, which involves a type of deliberateness, necessarily excludes conduct which is merely negligent." *Sutton*, 173 F.3d at 1238 (citing *Uhlrig*, 64 F.3d at 573; *Archuleta*, 897 F.2d at 499). As discussed below, of the actions that the Court can say were "affirmative," none were reckless, and the remaining actions alleged by

Moriarty to have endangered her were not sufficiently affirmative to qualify.

*i. Defendants' Selection of Moriarty and Harris for the Cookie Bandit Operation*

When Defendants approved Moriarty and Harris' assignment in the Jemez, that approval and any discussions that surrounded it necessarily involved affirmative decisions and actions. As noted above, the parties dispute whether Harris volunteered himself and Moriarty for the Cookie Bandit operation. The Court accepts the facts in the light most favorable to Moriarty (that it was Defendants who assigned Moriarty and Harris to the operation), but the outcome would be the same even if Harris had volunteered himself and Moriarty for the Cookie Bandit operation. This is because Defendants do not dispute that they approved Moriarty and Harris to carry out the operation. The Court believes that such approval, and the discussions and decisions that went into it, satisfies the affirmative conduct requirement.

Even so, in light of the undisputed facts (except, perhaps, as they appear in hindsight), Defendants' decision approving the operation does not seem "reckless." Moriarty and Harris may have been primarily SROs, but indisputably, they were also trained police officers, and both had extensive weapons training and knowledge from ongoing police procedures training. *See* Moriarty Depo. at 85-92. The two were not trained in any way for undercover work, but this fact is immaterial: Moriarty and Harris were not harmed because of any special undercover aspect of the operation. Their undercover work was a success in that they lured the Cookie Bandit into the Bonwell Cabin. It was only after Moriarty and Harris overcame and handcuffed the Cookie Bandit without searching him for a weapon that the Cookie Bandit somehow managed to obtain a gun from his person or from near him on the floor. Harris' and Moriarty's failure to search the Cookie Bandit and find the gun was a matter of basic police procedure, something for which they *had* been trained, even if they were not used to engaging in it on a daily basis.

As a result, even if the Court were to assume that, despite their training, Moriarty and Harris were in fact utterly unprepared for any encounter with a potentially dangerous criminal, the fact remains that at the time Defendants assigned Moriarty and Harris to this operation, Defendants had reason to believe that Moriarty and Harris were qualified to arrest a known felon such as the Cookie Bandit. In the first place, as discussed, Moriarty and Harris had received ongoing training; secondly, Defendants themselves did not know that the Cookie Bandit was as dangerous as he turned out to be. Before the Jemez operation, Defendants believed that the Cookie Bandit may be armed and dangerous and knew he had threatened people with weapons, including (perhaps) shooting Luke Dienlin, but this knowledge hardly sets the Cookie Bandit apart from other felons that trained police officers such as Moriarty and Harris might be sent to arrest when they were not in schools. This view is supported by the fact that Morrison and others at SCSO had previously conducted missions to try to capture the Cookie Bandit, apparently with no tactical plan, back-up, or better communications technology than Moriarty and Harris had for their operation. Thus, while Defendants acted affirmatively in sending Moriarty and Harris after the Cookie Bandit, the Court cannot find that Defendants acted recklessly or indifferently, because Defendants did not see, or even have reason to see, either the Cookie Bandit or the operation to find him as a "known or obvious risk that was so great that it was highly probable that serious harm would" come to two trained police officers. *Medina*, 960 F.2d at 1496.

*ii. Defendants' Failure to Tell Moriarty About the Cookie Bandit's Dangerousness*

Moriarty also claims that Defendants "affirmatively misled" her regarding the Cookie Bandit's dangerousness by allowing Moriarty to believe that he was just a "kooky old man." Summary Judgment Response at 39. The Tenth Circuit has acknowledged that "if the state 'affirmatively misleads an employee of the substantial risks in the workplace, that action *may*

give rise to § 1983 liability.'" *Robbins v. Okla.*, 519 F.3d 1242, 1252 (10th Cir. 2008) (quoting *Uhlrig*, 64 F.3d at 575) (emphasis added). However, the Tenth Circuit did not actually decide whether the state-created danger exception covers such misrepresentations, because the plaintiffs in *Robbins* did not actually allege that the defendants made affirmative statements on the quality of the daycare where the plaintiffs' decedent was injured. *See id.* at 1252. In this case, Moriarty alleges that Defendants affirmatively misled her with regard to what little they knew about the Cookie Bandit, encouraging her belief that the Cookie Bandit was no more than "some hermit who steals cookies . . . some crazy old guy." Moriarty Depo. at 140:3-4. Moriarty provides no convincing evidence of such encouragement by Defendants, but even if she had provided it, the Court would not find that this "lulling . . . into a false sense of security" amounted to affirmative misrepresentations. *Robbins*, 519 F.3d at 1252.

Moriarty's evidence regarding Defendants' affirmative misrepresentations is simply that Morrison and Lucero did not tell her what they knew of the Cookie Bandit's dangerousness, and told her and Harris that they "could bring [their] families and [their] dogs, [because] it would make it look more real," leading Moriarty to believe that she and Harris would just be posing as "hanging-out tourists." Moriarty Depo. at 154:9-23, 182:3-10; Summary Judgment Response at 38-40. Moriarty also asserts that Defendants' failure to tell her what they knew of the Cookie Bandit's dangerousness, and encouragement of her belief that he was harmless, mirrored their responses to inquiries from the public, which mentioned only one incident of the Cookie Bandit threatening gun violence, and not the Luke Dienlin shooting. *See* Summary Judgment Response at 39 (citing Lucero Letter). In Moriarty's view, Defendants' reticence about the matter when informing the public was part and parcel of Defendants' alleged active concealment from Moriarty of the Cookie Bandit's dangerousness. Moriarty argues that if matters such as the Luke

Dienlin shooting had been public or at least made known to her, she "would not have placed [herself] in harm's way, with no backup officers and with inadequate preparation and communication." Summary Judgment Response at 38-39.

Notably, however, Moriarty does not claim that Defendants told her there would be no danger in the assignment. Defendants' instructions to her and Harris to pose as tourists and take their families to the Jemez was a part of the undercover assignment, not a statement that she was actually going to be on vacation and so had literally nothing to worry about while she was on the assignment. Moriarty acknowledges that she was aware that the Cookie Bandit had broken into and stolen from cabins, and that as a police officer, she was trained to "operate on [the] premise" that a residential burglar "might be dangerous," if not necessarily someone wanted for murder, as the Cookie Bandit turned out to be. *See* Moriarty Depo. at 172-73. Moriarty attempts to skirt this reality by arguing that Defendants' misrepresentations meant that even though Moriarty knew the Cookie Bandit was a burglar, she did not know just how dangerous he was. *See* Summary Judgment Response at 39. Moriarty contends that she would not have been willing to go on the assignment if Defendants had not "encourag[ed] the belief that the Cookie Bandit was merely a nuisance, not a threat to life." Plaintiffs' Supplemental Briefing at 4. Moriarty says Defendants "should have known" that the Cookie Bandit was a serious threat at least from incidents like the Luke Dienlin shooting, if not from better efforts to obtain and process fingerprints that might have identified the Cookie Bandit and would have shown that he was wanted for murder. Moriarty Depo. at 173:21-174:20. However, Moriarty also admits, as she must, that Defendants were *not* aware that the Cookie Bandit was wanted for murder. *See* Moriarty Depo. at 173:21-174:3. The undisputed facts establish that, even if Defendants did not collect every possible fingerprint, Defendants did make attempts to collect fingerprints and sent

prints to the state crime lab. As a result, Defendants' failure to discover the Cookie Bandit's identity, even if negligent, cannot be characterized as intentional or even reckless. More importantly, any failure to collect fingerprints was not directed at Moriarty: Defendants obviously did not have Moriarty, or the future stakeout mission, in mind when they were taking or not taking fingerprints in the years preceding July 15, 2009 when Defendants and others at SCSO went to cabins where the Cookie Bandit had broken in, or when they found his campsites.

Also critical to this Court's consideration of whether Defendants affirmatively misled Moriarty is the fact that she met with Morrison and Lucero only once, and never spoke with Trujillo about the assignment. By Moriarty's own account of the meeting with Morrison and Lucero, it was not long and dealt little (if at all) with any representations about the Cookie Bandit and whether or not he was a danger. It was evidently more a discussion of what Moriarty and Harris would do while working undercover in the Jemez. Furthermore, Moriarty presents no competent evidence to counter Defendants' assertions that they gave Harris all the information they had about the Cookie Bandit. Since Moriarty was used to a paramilitary structure, one would expect that she would have been more likely to ask Harris, her direct supervisor, for information about the Cookie Bandit, rather than expecting to receive such information from Defendants, who were SCSO personnel very senior to her in rank. However, even if Defendants had not given Harris more information than they gave to Moriarty, the Court's conclusion would be the same. The most Moriarty can say of Defendants in this regard is that they did not tell her every detail they may have known about the Cookie Bandit, but not that Defendants actively misrepresented anything to her or that they actively concealed anything from her.

Moriarty compares Defendants' alleged misrepresentations to those at issue in a District of Colorado case that involved a state-created danger claim. *See Kuyper v. Bd. of Cnty. Comm'rs*

*of Weld Cnty., Colo.*, 2010 WL 1287534 (Mar. 30, 2010). In *Kuyper*, a foster family specifically

told the child placement agency that the family would not take in any children with a history of

sexual misconduct, but the agency subsequently placed with the family a child with a sexual

misconduct history, after assuring the family that he did not have such a history. *See id.* at *1.

The new child sexually molested another child in the family, and the parents sued. *See id.* In

denying the defendants' motion to dismiss, the court noted that the case did not involve "simply

a failure to warn," but rather featured active misrepresentations by the defendants that led to the

harm. *Id.* at *8. Moriarty claims that she has similarly "presented evidence that Defendants

affirmatively misrepresented the facts surrounding the shooting of Luke Dienlin" and that

Defendants failed to inform Moriarty and the general public about the shooting, leading to an

impression that the Cookie Bandit was not so dangerous. Summary Judgment Response at 39.

But even viewing the facts in the light most favorable to Moriarty, the Court cannot agree that

this case resembles *Kuyper*. At most, unlike *Kuyper*, this *is* a failure to warn case, though given

Defendants' lack of solid knowledge about the Cookie Bandit, it may not even be that.

     As noted, Defendants never misled Moriarty by telling her that the Cookie Bandit was

not dangerous. Further, Defendants could properly assume that Moriarty, as a trained police

officer, albeit one who was primarily an SRO, would go into the assignment as she said she did:

knowing and working on the knowledge that any residential burglar (especially one with as long

a history as the Cookie Bandit had of breaking into homes) could be armed and dangerous.

Unlike in *Kuyper*, Defendants misrepresented nothing to Moriarty, and certainly were not aware

that she was unprepared or unwilling for an assignment, as the family in *Kuyper* specifically said

it was. Moriarty does seem to have had the impression that the Cookie Bandit was a harmless

cookie stealer, despite her admission that residential burglars could be dangerous. But the

evidence does not show that any misrepresentations by Defendants led to this impression. Defendants may have told Moriarty and Harris to have a good time while camping—Moriarty's sole evidence that Defendants encouraged her misimpressions of the Cookie Bandit—but as a police officer, even an SRO, she was still trained to be alert and ready for danger in an encounter with a residential burglar. Even if that were not the case and Defendants knew Moriarty thought the Cookie Bandit was harmless (and there is no evidence of this), at most one could say that they "lull[ed her] . . . into a false sense of security." *Robbins*, 519 F.3d at 1252. However, as discussed, "lulling" or even false assurances "do not constitute affirmative conduct sufficient to invoke the state-created danger theory of constitutional liability." *Gray*, 672 F.3d at 925.

> *iii. Defendants' Failure to Provide Adequate Planning, Back-Up, or Communications to Moriarty and Harris for the Cookie Bandit Operation*

Moriarty's attempts to frame Defendants' other failures in the case as affirmative conduct are even more unsuccessful. As the Tenth Circuit has explained, this Circuit's "precedents consistently conclude that mere negligence or inaction is not enough" to amount to affirmative conduct for the purpose of the state-created danger standard. *Estate of B.I.C.*, 702 F.3d at 1187. Moriarty cites Defendants' failure to provide back-up at the cabin on the night of the shooting; their failure to provide a tactical plan in advance; and their failure to ensure that Moriarty and Harris were equipped with adequate communications technology, as affirmative conduct. *See* Summary Judgment Response at 37. However, the undisputed facts show not that Defendants actively refused to provide support that they knew was necessary, but rather that Defendants did not provide back-up, a tactical plan, or good communications technology, much as they had not provided it for previous expeditions in which Defendants themselves went to search for the Cookie Bandit. These are not the kind of "deliberate decision[s]" or refusals to do something, or

45

"intentional or malicious inaction" of the kind the Tenth Circuit has found to be adequately affirmative conduct to satisfy the state-created danger test. *Estate of B.I.C.*, 702 F.3d at 1188. Moriarty acknowledges that Defendants did not refuse any requests from her or Harris, but say that Defendants "refused to dedicate the resources necessary for a reasonably safe tactical operation to apprehend the Cookie Bandit . . . in the face of requests by the public." Plaintiffs' Supplemental Brief at 5. However, even if Moriarty had provided evidence of such requests or refusals, the refusal would not have been directed at Moriarty or her operation with Harris, and would not constitute affirmative conduct toward Moriarty for the purposes of the state-created danger test. Furthermore, unlike in *Estate of B.I.C.*, here there is no evidence that Defendants had any bad motive; indeed, the evidence is to the contrary, showing that Harris, in particular, was a friend to everyone at SCSO, such that no one would have wanted a bad outcome for the operation. *See, e.g.*, Moriarty Depo. at 129-30, Morrison Aff. at 1, Alexander Depo. at 78.

Overall, then, Moriarty can point to no conduct by Defendants that rose to the level of affirmative actions with the requisite culpability for a state-created danger claim. Though what happened was obviously tragic, the Court cannot say that anything Defendants did—even the decision to send Moriarty and Harris, inexperienced patrol officers, to investigate and possibly apprehend a residential burglar with a sketchy history of threatening violence—amounts to more than "mere negligence or inaction." *Estate of B.I.C.*, 702 F.3d at 1188. In addition, as Defendants argue, it is far from clear that even if Defendants had done anything differently, that the outcome of the stakeout would have been different, and a state-created danger claim cannot be predicated on speculative hindsight. *See* Motion for Summary Judgment at 28. Because Defendants' conduct appears to have been, at most, no more than negligent, the Court finds that Moriarty cannot satisfy the first prong of the state-created danger test. This failure alone would allow the

46

Court to grant Defendants' Motion for Summary Judgment, but the Court will also review the reasons why, even if Moriarty satisfied the first prong, her claim would still fail the state-created danger test's sixth prong, which requires that a defendant's actions shock the conscience.

*b. Whether Defendants' Conduct, When Viewed In Total, Shocks the Conscience*

A defendant's actions must cross a very high bar to be "conscience-shocking" in a federal constitutional sense. The Fourteenth Amendment's Due Process Clause protects people against "deliberately wrongful government decisions rather than merely negligent government conduct," so for conduct to be conscience-shocking, it must rise to a "high level of outrageousness." *Uhlrig*, 64 F.3d at 574.

As Moriarty emphasizes, courts look to the totality of the circumstances in assessing whether state action was "conscience shocking," meaning that even if individual acts do not rise to that level, a series of acts and omissions might. *See* Summary Judgment Response at 43. Moriarty also notes the "difference between decisions made in emergency situations, which are given great deference by courts, and decisions . . . made when the governmental actors have ample time to deliberate and plan." Summary Judgment Response at 43 (citing *Radecki v. Barela*, 146 F.3d 1227, 1231-32 (10th Cir. 1998)). The Tenth Circuit applies the "deliberate indifference" standard when the state actors have time to consider their actions. *See Radecki*, 146 F.3d at 1232 ("Where the state actor has the luxury to truly deliberate about the decisions he or she is making, something less than unjustifiable intent to harm, such as calculated indifference, may suffice to shock the conscience."); *Dobson v. City & Cnty. of Denver*, 13 F. App'x 842, 845 (10th Cir. 2001) (not published) (approving district court's use of deliberate indifference standard in state-created danger test under appropriate circumstances). Even so, it is also true that a state actor's "knowingly permitting unreasonable risks to continue does not necessarily

rise to the level of conscience shocking." *DeAnzona v. City and Cnty. of Denver,* 222 F.3d 1229, 1235 (10th Cir. 2000) (citing *Uhlrig*, 64 F.3d at 574). Thus, deliberate indifference in this context is many degrees beyond negligence.

Requiring plaintiffs to demonstrate that a defendant's conduct crossed this high bar from negligence to deliberateness, so as to be actually "conscience-shocking," furthers three principles identified by the Supreme Court as important in evaluating substantive due process claims: "(1) the need for restraint in defining [such claims'] scope; (2) the concern that § 1983 not replace state tort law; and (3) the need for deference to local policymaking bodies in making decisions impacting upon public safety." *Uhlrig,* 64 F.3d at 573. Application of these principles ensures that the state-created danger exception is reserved for exceptional circumstances. It is not that the courts or the Constitution condone negligence by state actors, but state tort law and a plethora of other legal restrictions exist to guide state actors' conduct and to punish them when they are negligent and their actions fall below certain standards. The Supreme Court has made it clear that substantive due process claims under the Constitution are meant to address only those actions by state actors that rise to a truly unconscionable level. *See, e.g.*, *Cnty. of Sacramento v. Lewis*, 523 U.S. 833 (1998); *Collins*, 503 U.S. 115 (1992).

The Court has considered all of the facts in their totality and in the light most favorable to Moriarty, and concludes that even if, contrary to the discussion above, Moriarty could make a satisfactory showing that Defendants affirmatively acted to endanger Moriarty, the Court would still not agree that Defendants' actions (or failures to act) shock the conscience. The standard is extremely high, and Defendants' failures to properly support Moriarty and Harris in their operation to apprehend the Cookie Bandit simply do not meet it. Moriarty is an adult police officer who, though lacking much recent day-to-day patrol experience, was qualified like all

48

other SCSO officers to make arrests and use weapons. Moriarty had no training in undercover operations, but her injuries were not related to any undercover aspect of the operation. Rather, Moriarty's injuries occurred after the undercover work had succeeded and the Cookie Bandit had been lured into the cabin. Defendants may have been naive or even negligent in sending Moriarty and Harris after the Cookie Bandit and thinking that back-up forces, a tactical plan, and good communications technology were not necessary, but the Court cannot conclude that they were "deliberately indifferent" to Moriarty's safety. Application of the principles outlined by the Supreme Court for limiting substantive due process claims also points to a conclusion that Moriarty's claim does not fit within the parameters of substantive due process.

Specifically, with regard to the intent behind Defendants' actions, the Court has already noted that with the exception of the choice to send Moriarty and Harris to the Jemez to gather information about and possibly apprehend the Cookie Bandit, none of the other actions attributed to Defendants are in fact "affirmative." The Court can thus hardly characterize these actions as reckless or even deliberately indifferent. As the Court has explained, the undisputed facts show that Defendants sent police officers, whom Defendants believed to have adequate training, on an assignment that Defendants themselves had taken part in previously under the same or similar conditions. This is not deliberate indifference. The remaining actions attributed to Defendants by Moriarty as having endangered her were, as discussed above, no more than negligent, if that, so they can also not be called "deliberately indifferent." As a result, though the operation certainly had a tragic outcome, the Court nonetheless cannot find that its conscience was shocked, because there is no evidence that Defendants were deliberately indifferent to Moriarty's safety.

The Court's conclusion is even more clear when it applies the three principles identified by the Supreme Court for use in assessing substantive due process claims. Mindful of the first

49

principle, requiring restraint in defining the scope of a plaintiff's substantive due process claim, the Court has carefully scrutinized the evidence most favorable to Plaintiff. As the Court's discussion has shown, the actions by Defendants that Moriarty alleges endangered and injured her were no more than negligent, if anything. Even considering the one element of affirmative conduct by Defendants that Moriarty has alleged—Defendants' assignment of Moriarty and Harris to the Cookie Bandit operation—the Court finds the conduct not even "deliberate" as defined by the Tenth Circuit in its discussions of "deliberate indifference," but rather possibly negligent, given Moriarty and Harris' basic qualifications as police officers. Defendants' other "actions"—not providing Moriarty with all information about the Cookie Bandit and not providing Moriarty and Harris with back-up or fully functional communications equipment— were not affirmative actions or even refusals to act, but simply failures to act. These actions are, at most, more suitably billed as "negligence."

Overall, Moriarty's Section 1983 claim bears much resemblance to state law tort claims, against which the Supreme Court cautions in its second limiting principle for defining what is "conscience shocking." As the Tenth Circuit has clearly stated, "where the behavior complained of seems more negligent than egregious or deliberate, we heed the Supreme Court's cautionary words and steer clear of territory of which we are not the best reviewers," and allow state courts to address the issue. *Moore v. Guthrie*, 438 F.3d 1036, 1041 (10th Cir. 2006). As in another Tenth Circuit case, the Court can regretfully note that "[i]n hindsight, perhaps some things could have been done differently, but, at most, such would be only negligence and insufficient to support a § 1983 claim." *Dobson,* 13 F. App'x at 845 (citing *Uhlrig*, 64 F.3d at 573, for the proposition that the Due Process Clause's protection does not extend to "merely negligent government conduct."). Because the sole source of affirmative conduct cited by Moriarty only

50

amounts, if anything, to negligence, which is not actionable under § 1983, this second limiting principle applies to the Court's consideration with force.

Finally, in this case more than many of the state-created danger cases that the Tenth Circuit has decided, the third limiting factor for finding what is "conscience shocking" applies: "the need for deference to local policymaking bodies in making decisions impacting upon public safety." *Uhlrig,* 64 F.3d at 574. Moriarty argues repeatedly that the Cookie Bandit operation was improperly designed and that there were many other things that could have and should have been done differently leading up to the night of July 15-16, 2009. Moriarty even points to details about the kind of cell phone provider service that was available and other minute aspects of the operation's background. *See* Summary Judgment Response at 34-40. However, it is not this Court's place to determine the details of how SCSO should carry out its work and assign its deputies. Moriarty's claims that SCSO's procedures were improper and led to her injuries are largely founded on speculation, because, as noted, it is not at all clear that if the operation were designed as she says it should have been, the outcome would have been entirely different. If the idea of deference to local policymaking bodies means anything, it means that this Court should not attempt to tell a police department how to run its operations, based on a single case and a plaintiff's speculation about how things might have been done better.

Considering the Supreme Court's limiting principles, as well as the reality that Defendants' actions and failures alleged by Moriarty did not involve deliberate or reckless conduct, the Court cannot say that its conscience is shocked by the facts Moriarty has presented, despite the terrible outcome for Moriarty and Harris. Moriarty's Complaint includes allegations of negligence and other state torts, and these claims may more properly address Moriarty's evidence, though the Court expresses no opinion on the merits of those claims. In any case, they

are not a federal constitutional matter, and as discussed below, will be better pursued in state court. Furthermore, because Moriarty has not demonstrated that she has suffered a violation of her constitutional rights, the Court need not analyze whether those alleged rights were "clearly established" at the time of their alleged violation by Defendants. *Pearson*, 555 U.S. at 227.

**C.**   <u>**Remaining State-Law Claims**</u>

The Court has jurisdiction over Plaintiffs' state-law claims by virtue of 28 U.S.C. § 1367(a), which provides that "the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." However, under 28 U.S.C. § 1367(c), a district court "may decline to exercise supplemental jurisdiction" in certain circumstances, including when no federal claims remain. In deciding whether to exercise jurisdiction, the district court is to consider "judicial economy, convenience, fairness, and comity." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988); *see also Nielander v. Bd. of Cnty. Comm'rs of Cnty. of Republic, Kan.*, 582 F.3d 1155, 1172 (10th Cir. 2009) (explaining factors guiding district court discretion under § 1367(c)). "When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims." *Koch v. City of Del City*, 660 F.3d 1228, 1248 (10th Cir. 2011), *cert. denied,* 133 S. Ct. 211 (2012), *reh'g denied,* 133 S. Ct. 684 (2012) (quoting *Smith v. City of Enid ex rel. Enid City Comm'n*, 149 F.3d 1151, 1156 (10th Cir. 1998).

Here, the only remaining claims are Plaintiffs' state-law claims against Defendants, and the Court finds that it may properly decline to exercise supplemental federal jurisdiction over those claims in accordance with 28 U.S.C. § 1367(c)(3). Because this case was not originally filed in federal court, but was removed from state court, the proper disposition of Plaintiff's

remaining state law claims would be a remand to state court rather than dismissal. *See Carnegie-Mellon Univ.,* 484 U.S. at 357 ("[A] district court has discretion to remand to state court a removed case involving pendent claims upon a proper determination that retaining jurisdiction over the case would be inappropriate."). In this case, since discovery is complete and the case is substantially ready for trial, the Court finds that an order of remand, rather than dismissal, "best serves the principles of economy, convenience, fairness, and comity which underlie the pendent jurisdiction doctrine." *Id.* Therefore, Plaintiffs' state-law claims of assault, battery, negligent infliction of emotional distress, negligence, breach of contract, and loss of consortium will be remanded to the state court from which they were removed, which is the Thirteenth Judicial District Court, County of Sandoval, New Mexico. Accordingly, the Court also declines to rule on Defendants' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' STATE TORT CLAIMS (Doc. No. 71) and on Defendants' MOTION TO EXCLUDE CERTAIN TESTIMONY FROM PLAINTIFFS' ECONOMIC EXPERT, MARK MCNULTY (Doc. No. 73), which can be addressed better in state court, where the state law claims will be tried.


**IT IS ORDERED THAT:**

(1) PLAINTIFFS' MOTION FOR LEAVE TO FILE RESPONSE TO DEFENDANTS' SUPPLEMENTAL BRIEF ADDRESSING MATTERS REQUESTED BY COURT DURING PRETRIAL CONFERENCE (Doc. No. 123) IS DENIED.

(2) DEFENDANTS' OBJECTION TO PLAINTIFFS' NOTICE OF SUPPLEMENTATION OF THEIR RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Doc. No. 113) IS DENIED.

(3) DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF PLAINTIFFS'

PROPOSED EXPERT D.P. VAN BLARICOM (Doc. No. 74) IS GRANTED IN PART.

(4) DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS'

TITLE 42 U.S.C. § 1983 CLAIM BASED ON QUALIFIED IMMUNITY AND OTHER

GROUNDS (Doc. No. 72) IS GRANTED.

(5) PLAINTIFFS' STATE-LAW CLAIMS WILL BE REMANDED TO THE

THIRTEENTH JUDICIAL DISTRICT, COUNTY OF SANDOVAL, NEW MEXICO.

_____

SENIOR UNITED STATES DISTRICT JUDGE